IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| D&K VENTURES, LLC, | ) |
|        Plaintiff, | ) |
| v. | ) Case No. 09-CV-2084 JWL/DJW |
| MGC, LLC, HURST CONSULTING, LLC, AUSTIN HURST and ZACHARY HURST, | ) |
|        Defendants. | ) |

## COMPLAINT

**(Jury Trial Demanded)**

COMES NOW D&K Ventures, LLC, and for its claims for relief against defendants MGC, LLC, Hurst Consulting, LLC, Austin Hurst and Zachary Hurst, alleges and states as follows:

### PARTIES AND JURISDICTION

1. Plaintiff D&K Ventures, LLC ("D&K") is a limited liability company organized and existing under the laws of the State of Missouri having its principal place of business therein.

2. Defendant MGC, LLC ("MGC") is a limited liability company organized and existing under the laws of the State of Missouri having its principal place of business therein.

3. Defendant Hurst Consulting, LLC ("Hurst") is a limited liability company organized and existing under the laws of the State of Kansas having its principal place of business therein.

4. Defendant Austin Hurst ("Austin") is a citizen of the State of Kansas residing in Johnson County, Kansas.

5. Defendant Zachary Hurst ("Zach") is a citizen of the State of Kansas residing in Johnson County, Kansas.

6. This is a civil action arising, *inter alia,* under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* and the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* and, accordingly, is a civil action arising under the laws of the United States over which this Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

7. This is a civil action arising, *inter alia*, under Acts of Congress regulating commerce over which the Court has original, subject matter jurisdiction pursuant to 28 U.S.C. § 1337.

8. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over and with respect to any and all claims asserted herein that do not arise under the laws of the United States.

## ALLEGATIONS COMMON TO ALL COUNTS

9. Dave Feyerabend ("Feyerabend") and Kelly Yarborough ("Yarborough") are the only members of D&K.

10. Upon information and belief, Austin and Zach are the only members of Hurst Consulting, LLC.

11. Upon information and belief, Austin, Zach and/or Hurst are the only members of MGC.

12. In August, 2008, Austin, Zach, Hurst, MGC and one "Asim Awan" ("Awan"), an officer and/or employee of Hurst approached D&K, Feyerabend and/or Yarborough amd solicited their "investment" in a "start up" venture known or to be known as "My Green Circle" ("Green Circle").

13. On September 2, 2008, Austin, Zach, Hurst, MGC and MGC's officer/employee Awan (collectively "defendants") met with D&K, Feyerabend and/or Yarborough regarding the purchase of an **"Investment Agreement"** whereby D&K would acquire or was allegedly to acquire a "2% ownership" in the Green Circle venture and in MGC, both of which were in the organizational and development "stage".

14. During their September 2, 2008 meeting, Austin, Zach, Hurst, MGC and/or Hurst's officer/employee Awan made the following representations to D&K, Feyerabend and/or Yarborough:

    a. That Green Circle would be a "so-called multi-level marketing" venture;

    b. That Green Circle/MGC would sell an "informative" DVD of thirty minutes duration, highlighting the benefits of what were described as "Social Networks" and/or "Viral Marketing";

    c. That Austin, Zach, Hurst, MGC and/or Hurst's officer/employee Awan had developed a unique and proprietary "web-based system" which would provide those persons who visited MGC's Green Circle website with an equally unique "referral link";

    d. That this proprietary "web-based system" of marketing would involve a "participant site" which MGC/Green Circle would use to market the DVD to recruit new participants, to track sales, to transfer money and to communicate with so-called "down line" participants.

15. During their September 2, 2008 meeting, Austin, Zach, Hurst, MGC and Hurst's officer/employee Awan provided D&K, Feyerabend and/or Yarborough with a two page **"MyGreenCircle.com Information Sheet"** intended and designed to explain the nature of the investment to be memorialized by the "Investment Agreement" and the return which would then be achieved or obtained upon such investment.

16. A copy of that "Information Sheet" is attached to this Complaint as **EXHIBIT 1** and by reference incorporated herein.

17. The first page of this "Information Sheet" contained and contains the following statements and representations:

   a. That Green Circle/MGC was to be "an online company" that promoted a "DVD that teaches viewers about viral marketing";

   b. That MGC had "created the DVD in-house and" would be "selling the DVD on" what was described as "the website";

   c. That MGC would offer "visitors to the website the ability to enroll in a program by which they [would] be compensated for referring other individuals to purchase the DVD";

   d. That "in order to receive a DVD, a user" would be required to "pay $12.99" and that "[i]n order for a user to benefit from the program", the user would be required to "register an account and refer other members" who would themselves "purchase a DVD";

   e. That for "every DVD purchase referral", there would be "a credit of $1.50 added to the referrers account" and that MGC would pay these credits to referrers once a month either "directly into Paypal accounts" by "traditional ACH wire transfer[ ]" or "in the form of a check" at the user's option.

18. The second page of the "Information Sheet" purported to depict the "potential opportunity" represented by this scheme, graphically, through the use of a pyramid. Beneath the pyramid was a series of ratio-based calculations identified as a **"Projected Financial Statement"**.

19. The **"Projected Financial Statement"** contains the following statements and representations:

   a. That in six months of operations, the number of persons "participating" in, i.e. "signing up" for, MGC's multi-level marketing scheme would increase from 1,000 participants to **32,768,000** participants;

   b. That in six months of operations, the number of "new" participants "signed-up" each month would increase from 1,000 to **28,672,000** participants;

   c. That in six months of operations, MGC's gross revenue could increase from $12,990 in "Month 1" to **$254,332,109**;

      d.    That in six months of operations, MGC's "net revenue" would increase from $11,490 in "Month 1" to **$211,324,109** in "Month 6".

20.    On September 5, 2008, Hurst's officer/employee Awan transmitted what were purported to be "updated projections" to D&K based, allegedly, on "new found information".

21.    Copies of Hurst's/Awan's letter/e-mail of transmittal and of the "updated projections" themselves are attached to this Complaint as **EXHIBITS 2** and **3** respectively and by reference incorporated herein.

22.    Hurst/Awan's letter/e-mail of transmittal contains the following statements and representations:

      a.    That the "updated projections" which were attached were based upon otherwise unspecified "new found information";

      b.    That "the original projections that were shown" to D&K "earlier [that] week" was the "main one to focus on";

      c.    That these earlier projections were and remained "the conservative and more realistic projection based on all people participating at the same level";

      d.    That, nevertheless, in the projections which Hurst/Awan had "done now", it/he had "assumed that people" would enter, i.e. participate in MGC's multi-level marketing scheme, in or at "different levels";

      e.    That "based on the new projections, the net revenue [had] increased by approximately $75 [million]"; and

      f.    That although these were "projections", they "should" nevertheless "give" D&K "a good idea of how things work out based on what" Awan, Hurst, MGC, Austin and Zach were "expecting".

23.    The "updated projections" which were attached to Hurst/Awan's letter/e-mail of transmittal contained, *inter alia*, the following statements and representations:

      a.    Under Hurst/Awan's "Level II Referral" scenario, MGC's total members/participants would increase from 1,000 in Month 1 to 266,605,691 in Month 6 or roughly 37,000,000 less than the total estimated population of the United States;

      b.     MGC's total revenue would increase from $3,990 in Month 1 to $1,045,983,016 in Month 6; and

      c.     MGC's net revenues would increase from $3,591 in Month 1 to $941,384,714 in Month 6.

24. In addition to the statements and representations identified above, during the period of and from September 2, 2008 through approximately September 12, 2008, Austin, Zach, Hurst, MGC and Hurst's officer/employee Awan made, gave, sent and/or transmitted the following additional statements and representations to D&K, Feyerabend and Yarborough:

      a.     That through an investment of $115,000, D&K would acquire a 2% ownership in and of MGC and Green Circle;

      b.     That other investors were being solicited and that for each investment of $75,000, the investor would receive 1% of the ownership of MGC and Green Circle;

      c.     That MGC would launch Green Circle on the internet on October 1, 2008;

      d.     That the development and testing of the system, hardware and/or software that was to be and constitute MGC's unique, multi-level marketing system had been comprehensive and was nearly complete, and that such further development and testing as was necessary was fully on schedule; and

      e.     That the promoters and persons in charge of MGC were highly experienced in "web" marketing and in "multi-level" marketing, that they were highly skilled in web design and implementation and that the concepts, devices, features and/or mechanisms which they intended to employ in the design of MGC's "website" were novel, attractive, useful, utilitarian and user friendly.

25. At some time during the period of September 2, 2008 through September 12, 2008, D&K entered into and purchased a purported "Investment Agreement" with and from MGC, Austin, Zach and/or Hurst and, in exchange for such **"Investment Agreement"**, D&K paid the sum of $115,000.00 to MGC, Austin, Zach and/or Hurst.

26. A copy of that **"Investment Agreement"** is attached to this Complaint as **EXHIBIT 4** and by reference incorporated herein.

27. Notwithstanding the statements, promises and representations made to D&K, Feyerabend and/or Yarborough by MGC, Austin, Zach, Hurst and/or Hurst's officer/employee Awan, to the effect that D&K would acquire a 2% ownership interest in and of MGC, paragraph 11 of the "**Investment Agreement**" provides that the agreement did not "confer upon or entitle" D&K "to any membership interest in" MGC "equitable, passive or otherwise".

28. Subsequent to D&K's purchase of the "**Investment Agreement**" (**EXHIBIT 4**), and otherwise on October 3, 2008, MGC, Austin and Hurst convened and hosted a purported "launch party" at which they announced that they had failed to launch the Green Circle website on October 1, 2008 as they had promised, and that such launch date would not occur until October 10, 2008.

29. On October 10, 2008, MGC attempted to launch its Green Circle website, which launch was wholly unsuccessful for the following reasons, among others:

    a. Feedback by viewers/visitors to the website indicated that the website was "confusing";

    b. Feedback by visitors to the website indicated doubts by visitors as to precisely what product or products MGC was selling;

    c. Feedback by visitors to the website indicated confusion by viewers as to what MGC was, whether it was indeed a multi-level marketing organization and, if so, how its multi-level marketing organization was supposed to work;

    d. Those few viewers who were able to identify what MGC hoped to sell were unable to purchase that commodity; and

    e. Those few viewers who understood that they were being invited to sign up as participants in MGC's multi-level marketing program, could not do so.

30. On October 20, 2008, MGC, Austin, Zach and Hurst acknowledged that the attempted launch had failed and announced their intention to create a plan for "remarketing" Green Circle, its products, its multi-level marketing system and its website.

31. On November 15, 2008, MGC attempted to launch a new site with moderate success. The new site, however, and the products, programs and commercial activities to which the website was intended to promote were distinctly and materially different from the products, programs and commercial activities in which D&K had invested through its purchase of the $115,000.00 "**Investment Agreement**".

32. To date, D&K has received none of the returns, revenues and/or income which were promised to it at the time it purchased the "**Investment Agreement**".

33. By letter dated February 4, 2009, a copy of which is attached to this Complaint as **EXHIBIT 5** and by reference incorporated herein, D&K demanded the return of the $115,000.00 which it paid for the "**Investment Agreement**".

34. MGC, Hurst, Austin, Zach and Hurst's officer/employee Awan have failed and refused to respond to that demand.

## COUNT I
### (Violations of the Securities Act, 15 U.S.C. §§ 77a-77bbb and the Securities Exchange Act, 15 U.S.C. §§ 78a-78mm)

35. D&K restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-34 hereinabove.

36. The "**Investment Agreement**" is, by its terms, an "investment contract" and thus a "security" within the meaning of § 2 of the Securities Act, 15 U.S.C. § 77b(a)(1).

37. The "**Investment Agreement**" has, at no time, been registered as a security with the United States Securities & Exchange Commission ("SEC") within the meaning of §§ 5 and 6 of the Securities Act, 15 U.S.C. §§ 77e and 77f.

38. Defendants cannot sustain or satisfy their burden to prove that the "**Investment Agreement**" was exempt from registration, whether under 15 U.S.C. §77c(a) 11, 15 U.S.C.

§ 77d(2), SEC Regulation 147, 17 C.F.R. § 230.147, SEC Regulation A, 17 C.F.R. §§ 230.251-230.263, SEC Regulation D, 17 C.F.R. §§ 230.501-230.508, or otherwise.

39. For these and other reasons, the "**Investment Agreement**" violated and violates the Securities Registration Laws of the United States and as provided under 15 U.S.C. § 78cc(b) is void, unenforceable and of no legal effect.

40. In connection with the sale of the "**Investment Agreement**" to D&K, the defendants and each of them made or employed and/or are controlling persons of another defendant which, in connection with the sale of the "**Investment Agreement**" to D&K made, employed or engaged in the use or making of, untrue statements of material fact or omissions of material fact necessary to make the statements that were made not misleading, in violation of 15 U.S.C. § 77l and SEC Rule 10b-5, 17 C.F.R. § 240.10(b)-5, and/or manipulative or deceptive devices or contrivances in violation of 15 U.S.C. § 78j(b), and/or schemes or artifices to defraud and/or acts, practices, conduct or courses of business which operated as a fraud or deceit upon D&K in violation of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 for the following reasons, among others:

   a. Defendants, and each of them, told, advised, stated, promised, assured and represented that Green Circle would be a "so-called multi-level marketing" venture, when in truth and in fact it had nothing to market and/or was incapable of marketing anything;

   b. Defendants, and each of them, told, advised, stated, promised, assured and represented that Austin, Zach, Hurst, MGC and/or Hurst's officer/employee Awan had developed a proprietary "web-based system" which would provide those persons who visited MGC's Green Circle website with a purportedly unique "referral link", when in truth and in fact the system was and proved to be wholly non-functional;

   c. Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, the number of persons "participating" in, i.e. "signing up" for, MGC's multi-level marketing scheme would increase from 1,000 participants to **32,768,000** participants,

when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

d. Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, the number of "new" participants "signed-up" each month would increase from 1,000 to **28,672,000** participants, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

e. Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, MGC's revenue could increase from $12,990 in "Month 1" to **$254,332,109**, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

f. Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, MGC's "net revenue" would increase from $11,490 in "Month 1" to **$211,324,109** in "Month 6", when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

g. Defendants, and each of them, told, advised, stated, promised, assured and represented that these were and remained "the conservative and more realistic projection[s]", when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

h. Defendants, and each of them, told, advised, stated, promised, assured and represented that in subsequent projections which Hurst/Awan had prepared, an assumption had been made that "participants" would "enter" MGC's marketing scheme at "different levels";

i. Defendants, and each of them, told, advised, stated, promised, assured and represented that "based on new projections, the net revenue [had] increased by approximately $75 [million]", when in truth and in fact there was and would be no net revenue;

j. Defendants, and each of them, told, advised, stated, promised, assured and represented that although these were "projections", they "should" nevertheless "give" D&K "a good idea of how things work out based on what" Awan, Hurst, MGC, Austin and Zach were "expecting", when in truth and in fact there was and would be no net revenue;

k. Defendants, and each of them, told, advised, stated, promised, assured and represented that under Hurst/Awan's "Level II Referral" scenario, MGC's total members/participants would increase from 1,000 in Month 1 to 266,605,691 or some 37,000,000 less than the total estimated population

    of the United States, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

l.  Defendants, and each of them, told, advised, stated, promised, assured and represented that MGC's total revenue would increase from $3,990 in Month 1 to $1,045,983,016 in Month 6, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

m.  Defendants, and each of them, told, advised, stated, promised, assured and represented that MGC's net revenues would increase from $3,591 in Month 1 to $941,384,714 in Month 6, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

n.  That through an investment of $115,000, D&K would acquire a 2% ownership in and of MGC and Green Circle, when in truth and in fact no such ownership was conveyed;

o.  That other investors were being solicited and that for each investment of $75,000, the investor would receive 1% of the ownership of MGC and Green Circle, when in truth and in fact no ownership would be conveyed;

p.  That MGC would launch Green Circle on the internet on October 1, 2008, when in truth and in fact such launch could and would not occur until October 15, 2008;

q.  That the system, hardware and/or software that was to be and constitute MGC's unique, multi-level marketing system had been almost completely developed and tested and that such further development and testing as was necessary was fully on schedule, when in truth and in fact such system was poorly designed, poorly developed, wholly untested and could not be made to function properly; and

r.  That the promoters and persons in charge of MGC were highly experienced in "web" marketing and in "multi-level" marketing, that they were highly skilled in web design and implementation and that the concepts, devices, features and/or mechanisms which they intended to employ in the design of MGC's "website" were novel, attractive, useful, utilitarian and user friendly, when in truth and in fact they were unskilled and inexperienced and such system was poorly designed, poorly developed, wholly untested and could not be made to function properly.

41.  Defendants made, published or transmitted each of these statements or omitted to make, publish or transmit each of the statements and engaged or failed to engage in the acts,

conduct and/or courses of business identified above willfully and knowingly for the reasons, *inter alia*:

  a. That defendants, and each of them, knew or should have known that their predictions, forecasts and assurances of the sales, revenues and profits to be derived from Green Circle were no more than an exercise in geometric progression and that such exponential growth was not commercially possible;

  b. That defendants, and each of them, knew or should have known that the programming, software, apparatus and devices with and from which Green Circle was to be constructed, launched and maintained were so poorly and defectively planned, programmed, engineered, constructed and/or made, that early users of the Green Circle "website" could not even determine what it was that Green Circle even wished to sell;

  c. That defendants, and each of them, knew and should have known that the "multi-level marketing" scheme represented by Green Circle would fail for the reason that upon reasoned examination of Green Circle's website and its purported "products" by visitors/prospective participants, it would clearly appear that, in truth, defendants had nothing to sell and/or nothing of value sufficient to warrant purchase and that the only thing Green Circle offered paying participants was the opportunity to recoup their otherwise wasted money by inducing others to become successor-victims.

42. As a direct and proximate result of defendants' conduct, as aforesaid, D&K has been damaged.

## COUNT II
### (Violation of the Missouri Securities Act of 2003, Mo. Rev. Stat. §§ 409.1-101 through 409.7-703)

43. D&K restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-42 hereinabove.

44. The "**Investment Agreement**" is, by its terms, an "Investment Contract" and thus a "security" within the meaning of Mo. Rev. Stat. § 409.1-102 (28); defendants have failed to register the "**Investment Agreement**" with the Missouri Commissioner of Securities as required under Mo. Rev. Stat. § 409.3-301 and defendants cannot satisfy or sustain their burden of

proving the "**Investment Agreement**" is exempt from registration, whether under Mo. Rev. Stat. §§ 409.2-201, 409.2-202, 409.2-203, or otherwise.

45.     For these and other reasons, the "**Investment Agreement**" violated and violates the Securities Registration Laws of the State of Missouri and, as provided under Mo. Rev. Stat. § 409.5-509(k) and is void, unenforceable and of no legal effect.

46.     In connection with the sale of the "**Investment Agreement**" to D&K, the defendants and each of them, made or employed and/or are controlling persons of an entity which, in connection with the sale of the "**Investment Agreement**" to D&K, made, employed or engaged in untrue statements of material fact or omissions of material fact necessary to make the statements that were made not misleading; manipulative and/or deceptive devices or contrivances and/or schemes or artifices to defraud and/or acts, conduct, practices or courses of business which operated as a fraud or deceit upon D&K for the following reasons, among others:

   a.  Defendants, and each of them, told, advised, stated, promised, assured and represented that Green Circle would be a "so-called multi-level marketing" venture, when in truth and in fact it had nothing to market and/or was incapable of marketing anything;

   b.  Defendants, and each of them, told, advised, stated, promised, assured and represented that Austin, Zach, Hurst, MGC and/or Hurst's officer/employee Awan had developed a proprietary "web-based system" which would provide those persons who visited MGC's Green Circle website with a purportedly unique "referral link", when in truth and in fact the system was and proved to be wholly non-functional;

   c.  Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, the number of persons "participating" in, i.e. "signing up" for, MGC's multi-level marketing scheme would increase from 1,000 participants to **32,768,000** participants, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

   d.  Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, the number of "new" participants "signed-up" each month would increase from 1,000 to **28,672,000** participants, when in truth and in fact such predictions were

wholly and completely unrealistic and far beyond defendants' ability to achieve;

e. Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, MGC's revenue could increase from $12,990 in "Month 1" to **$254,332,109**, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

f. Defendants, and each of them, told, advised, stated, promised, assured and represented that in six months of operations, MGC's "net revenue" would increase from $11,490 in "Month 1" to **$211,324,109** in "Month 6", when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

g. Defendants, and each of them, told, advised, stated, promised, assured and represented that these were and remained "the conservative and more realistic projection[s]", when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

h. Defendants, and each of them, told, advised, stated, promised, assured and represented that in subsequent projections which Hurst/Awan had prepared, an assumption had been made that "participants" would "enter" MGC's marketing scheme at "different levels";

i. Defendants, and each of them, told, advised, stated, promised, assured and represented that "based on new projections, the net revenue [had] increased by approximately $75 [million]", when in truth and in fact there was and would be no net revenue;

j. Defendants, and each of them, told, advised, stated, promised, assured and represented that although these were "projections", they "should" nevertheless "give" D&K "a good idea of how things work out based on what" Awan, Hurst, MGC, Austin and Zach were "expecting", when in truth and in fact there was and would be no net revenue;

k. Defendants, and each of them, told, advised, stated, promised, assured and represented that under Hurst/Awan's "Level II Referral" scenario, MGC's total members/participants would increase from 1,000 in Month 1 to 266,605,691 or some 37,000,000 less than the total estimated population of the United States, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

l. Defendants, and each of them, told, advised, stated, promised, assured and represented that MGC's total revenue would increase from $3,990 in Month 1 to $1,045,983,016 in Month 6, when in truth and in fact such

               predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

m.    Defendants, and each of them, told, advised, stated, promised, assured and represented that MGC's net revenues would increase from $3,591 in Month 1 to $941,384,714 in Month 6, when in truth and in fact such predictions were wholly and completely unrealistic and far beyond defendants' ability to achieve;

n.    That through an investment of $115,000, D&K would acquire a 2% ownership in and of MGC and Green Circle, when in truth and in fact no such ownership was conveyed;

o.    That other investors were being solicited and that for each investment of $75,000, the investor would receive 1% of the ownership of MGC and Green Circle, when in truth and in fact no ownership would be conveyed;

p.    That MGC would launch Green Circle on the internet on October 1, 2008, when in truth and in fact such launch could and would not occur until October 15, 2008;

q.    That the system, hardware and/or software that was to be and constitute MGC's unique, multi-level marketing system had been almost completely developed and tested and that such further development and testing as was necessary was fully on schedule, when in truth and in fact such system was poorly designed, poorly developed, wholly untested and could not be made to function properly; and

r.    That the promoters and persons in charge of MGC were highly experienced in "web" marketing and in "multi-level" marketing, that they were highly skilled in web design and implementation and that the concepts, devices, features and/or mechanisms which they intended to employ in the design of MGC's "website" were novel, attractive, useful, utilitarian and user friendly, when in truth and in fact they were unskilled and inexperienced and such system was poorly designed, poorly developed, wholly untested and could not be made to function properly.

47.    As a direct and proximate result of defendants' conduct as aforesaid, D&K has been damaged in an amount exceeding $115,000.00.

48.    In addition, and in an attempt to recover the sums and monies which it paid to defendants for the **"Investment Agreement"** including, *inter alia*, through the filing of this

action, D&K has incurred costs and expenses, including attorneys' fees, and will continue to incur costs and expenses including attorneys' fees.

## COUNT III
### (Intentional Fraud)

49. D&K restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-48 hereinabove.

50. The statements and representations made and given to D&K by MGC, Austin, Zach, Hurst and Hurst's officer/employee Awan as detailed and described in ¶¶ 17, 18, 19, 22, 23 and 24 hereinabove were false for the reasons identified in ¶¶ 40 and 46 hereof.

51. Defendants knew that such statements and representations were false or were ignorant of the truth or falsity thereof.

52. Defendants intended that such statements and representations be acted upon by D&K through the purchase by D&K of the "**Investment Agreement**", and thus in a manner reasonably contemplated by defendants.

53. D&K was itself ignorant of the falsity of such statements and representations.

54. D&K relied and had a right to rely upon the purported truth of such statements and representations.

55. As a direct and proximate result of such false statements and false representations, D&K has been damaged in an amount exceeding $115,000.00.

## COUNT IV
### (Negligent Misrepresentation)

56. D&K restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-57 hereinabove.

57. Defendants supplied or participated in supplying facts and information to D&K in the ordinary course of their business or respective businesses including, but not limited to:

   a. The facts and information identified in ¶ 17 hereinabove;

   b. The facts and information identified in ¶ 18 hereinabove;

   c. The facts and information described in ¶ 19 hereinabove;

   d. The facts and information described in ¶ 22 hereinabove;

   e. The facts and information described in ¶ 23 hereinabove; and

   f. The facts and information described in ¶ 24 hereinabove.

58. Defendants had a duty to exercise reasonable care to determine whether the facts and information which it supplied to D&K, as detailed and described in ¶¶ 17, 18, 19, 22, 23 and 24 hereinabove, was true or false.

59. Defendants failed to exercise such reasonable care and as a consequence, the information which they supplied to D&K was indeed false for all of the reasons identified in ¶¶ 40 and 46 hereof.

60. Such information was provided by defendants, knowingly and intentionally, for the guidance of D&K in the context of D&K's purchase of the "**Investment Agreement**".

61. Given the trust and confidence which defendants, and each of them, attempted to engender and did engender in D&K and the fact that defendants possessed unique and specialized facts and information unknown and unavailable to D&K, D&K relied justifiably upon the facts and information supplied to them by defendants.

62. As a direct and proximate result of its reliance upon such facts and information, D&K has suffered actual pecuniary losses in an amount exceeding $115,000.00.

## RELIEF REQUESTED

WHEREFORE, upon all of the claims and causes of action identified above, D&K requests the following relief against defendants MGC, Hurst, Zach and Austin, and each of them:

A. For judgment in favor of D&K and against MGC, Hurst, Zach and Austin jointly and severally in an amount equal to the damages suffered and incurred by D&K as a result of defendants' intentional misrepresentations including, without limitation, consequential damages, and otherwise in an amount exceeding $115,000.00;

B. For judgment in favor of D&K and against MGC, Hurst, Zach and Austin jointly and severally in an amount equal to the damages suffered and incurred by D&K as a result of defendants' negligent misrepresentations including, without limitation, consequential damages, and otherwise in an amount exceeding $115,000.00;

C. For judgment in favor of D&K and against MGC, Hurst, Zach and Austin, jointly and severally, for damages in an amount equal to the consideration paid by D&K for the **"Investment Agreement"** together with interest thereon from the date of purchase and D&K's reasonable attorneys' fees and costs;

D. For a preliminary and permanent injunction enjoining, restraining and prohibiting defendants from any and all of the conduct identified in this Complaint and for the cost and attorneys' fees expended and incurred by D&K in obtaining such relief;

E. For punitive damages as hereinafter determined, and otherwise in an amount sufficient to punish defendants and to deter similar conduct by others; and

F. For such other and further relief as may be justified in the premises.

## JURY DEMAND

Plaintiff demands trial, by jury, upon all issues properly triable by the same in Kansas City, Kansas.

Respectfully submitted,

McDOWELL RICE SMITH & BUCHANAN

*/s/ James F.B. Daniels*
R. Pete Smith, KS Bar #07200
James F.B. Daniels, Fed. Bar #70468
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 telecopier
petesmith@mcdowellrice.com
jdaniels@mcdowellrice.com

ATTORNEYS FOR PLAINTIFF